

# Arbitral Award

Shanghai International Economic and Trade Arbitration Commission (Shanghai International

Arbitration Center)

# Shanghai International Economic and Trade Arbitration Commission

## (Shanghai International Arbitration Center)

## Arbitral Award

Applicant:   CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile:   Building 2, No. 68, Gangde Road, Xiaokunshan Town, Songjiang District, Shanghai Municipality

Attorneys:   Hu Mei, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch

Yu Simin, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch

Liu Qian, Lawyer of Beijing King & Wood Mallesons Law Firm Shanghai Branch

Respondent: LUMOS LLC

Domicile:   3550 Frontier Avenue, #C2, Boulder, United States

Attorneys:   Xiong Wei, Lawyer of Guangdong WANG JING & CO. Shanghai Branch

Gao Ya, Lawyer of Guangdong WANG JING & CO. Shanghai Branch

**Shanghai**

**June 13, 2014**



## Arbitral Award

[2014] H. M. Z. C. Zi. No. 138

In accordance with the arbitration clause set out in the *Sales Contract* No. S69020043, which Contract was signed by and between the Applicant CEEG (Shanghai) Solar Science & Technology Co., Ltd. (hereinafter referred to as "the Applicant") and the Respondent LUMOS LLC (hereinafter referred to as "the Respondent"), as well as the arbitration application submitted by the Applicant to the Commission on March 22, 2013, China International Economic and Trade Arbitration Commission Shanghai Branch (now renamed as "Shanghai International Economic and Trade Arbitration Commission", also known as "Shanghai International Arbitration Center", hereinafter referred to as "the Commission") accepted the case of dispute arbitration under the aforesaid *Sales Contract* on April 1, 2013 after the Applicant handled relevant formalities including prepayment for the arbitration cost. The number of the case is SG2013023.

*Arbitration Rules of China International Economic and Trade Arbitration Commission Shanghai Branch* (hereinafter referred to as "*the Arbitration Rules*") implemented from May 1, 2012 applies to the arbitration procedure of this case.

The Secretariat of the Commission (hereinafter referred to as "the Secretariat") issued acceptance notice/arbitration notice, *Arbitration Rules* and *List of Arbitrators* to the Applicant and the Respondent on April 1, 2013, and also sent to the Respondent the arbitration application and attachments which were submitted by the Applicant.

In accordance with the stipulations set out in the *Arbitration Rules*, an arbitration tribunal composed of three arbitrators heard the case. The Applicant appointed Mr. Chen Gang as the Arbitrator. The Respondent failed to choose or entrust the Director of the Commission to designate an arbitrator within the term stipulated by the *Arbitration Rules*, and the Director of the Commission appointed Mr. Liu Ying as its arbitrator according to Item (I), Clause 22 of the *Arbitration Rules*. Whereas the Applicant and the Respondent failed to choose jointly or entrust the Director of the Commission to designate the Chief Arbitrator according to the stipulations set out in the *Arbitration Rules*, the Director appointed Ms. Liu Xiaohong as Chief Arbitrator according to the stipulations set out in in Item (IV), Clause 22 of the *Arbitration Rules*. The three arbitrators aforesaid all signed the *Arbitrator's Declaration*, and established the arbitration tribunal on May 27, 2013 to hear the case jointly. The arbitration tribunal decided to open a court session on June 27, 2013. The Secretariat sent the *Notice of Composition of Arbitration Tribunal* and the *Notice of Hearing* to the Applicant and the

Respondent on May 27, 2013.

The Respondent submitted an application for extension of hearing on June 20, 2013. The Secretariat forwarded the said document to the Applicant and the arbitration tribunal on June 21, 2013, and also requested the Applicant to make written comments. On June 24, 2013, the Applicant submitted the written comments on the aforesaid application made by the Respondent, and the Secretariat forwarded the said document to both the Applicant and the Respondent on the same day. After penal discussion, the arbitration tribunal approved the Respondent's application for extending the date of hearing and entrusted the Secretariat to inform both parties of such decision in writing on June 24, 2013.

The arbitration tribunal decided to extend the open session of the case until September 14, 2013, and the Secretariat sent the notice of extension of court hearing to both parties on July 29, 2013. Later, the arbitration tribunal decided to adjust the time of court session, i.e. in the morning of September 14, 2013, to the afternoon of the same day, and also entrusted the Secretariat to inform both parties of such matter in writing on August 5, 2013.

The Respondent submitted jurisdiction objection on September 11, 2013. The Secretariat forwarded such file to the Applicant and the arbitration tribunal on the same day, and also requested the Applicant to make written comments on the file. On September 12, 2013, the Applicant submitted the opinions on the aforesaid jurisdiction objection raised by the Respondent, and the Secretariat forwarded such file to both the Respondent and the arbitration tribunal on the same day.

On September 13, 2013, the Commission made "[2013] H. M. Z. Zi. No. 4801" *Resolution on Jurisdiction* to reject the Respondent's jurisdiction objection, and held that the arbitration procedure of the case shall be implemented continuously.

On September 14, 2013, the arbitration tribunal opened the court session to hear the case in the location of the Commission. The arbitration attorneys of both the Applicant and the Respondent appeared in the court for hearing. The two parties made presentations on facts and legal issues of the case, questioned the evidences, answered the questions raised by the arbitration tribunal, debated and gave final statement opinions. Before the hearing was finished, the arbitration tribunal arranged for the arbitration procedures after the session.

Attorneys of the Respondent submitted the attorneys' opinions and supplementary evidences on September 27, 2013. The Secretariat forwarded such materials to the Applicant and the tribunal on September 29, 2013, and also requested the Applicant to give written cross-examination opinions on

the supplementary evidences submitted by the Respondent.

The Applicant's attorneys submitted the attorneys' opinions and supplementary evidences on September 30, 2013. The Secretariat forwarded such materials to the Respondent and the tribunal on October 8, 2013, and also requested the Respondent to give written cross-examination opinions on the supplementary evidences submitted by the Applicant.

On October 14, 2013, the Applicant submitted the' cross-examination opinions on the supplementary evidences submitted by the Respondent after the court hearing. The Secretariat forwarded such materials to the Respondent and the tribunal on October 15, 2013. The Respondent submitted written comments on cross-examination opinions mentioned above on October 22, 2013, and the Secretariat forwarded such documents to the Applicant and the tribunal on October 24, 2013.

The Respondent submitted a written document named *Request on Further Explanations on the Evidences of the Case* on October 28, 2013, requesting the arbitration tribunal to open a court session to hear the case again. The Secretariat forwarded such documents to the Applicant and the arbitration tribunal on October 29, 2013. On November 4, 2013, the Applicant submitted the comments on the preceding documents submitted by the Respondent. After penal discussion, the arbitration tribunal decided to open the second court session to hear the case on December 12, 2013, and also entrusted the Secretariat to send the notice of court session to both parties on November 13, 2013.

On December 12, 2013, the arbitration tribunal opened the court session for the second time to hear the case at the location of the Commission. The arbitration attorneys of both the Applicant and the Respondent appeared in the court for hearing. The two parties made further presentations on facts and legal issues of the case, carried out cross-examinations on the supplementary evidences, answered the questions raised by the arbitration tribunal, debated and gave final statement opinions. Before the hearing was finished, the arbitration tribunal arranged for the arbitration procedures after the session.

Attorneys of the Respondent submitted the supplementary attorneys' opinions on December 26, 2013. The Secretariat forwarded the file to the Applicant and the tribunal on December 27, 2013. Attorneys of the Applicant submitted the supplementary attorneys' opinions on January 28, 2014, and the Secretariat forwarded the file to the Respondent and the tribunal on February 7, 2014.

Upon application of the arbitration tribunal, the Secretary-general of the Commission, based on the stipulations set out in Item (III), Clause 43 of the *Arbitration Rules*, agreed to extend the term of judgment on the case to June 13, 2014.

All legal documents, notices and materials related with the case have been sent to the parties concerned in the case and the arbitration tribunal effectively according to the stipulations set out in Clause 60 of the *Arbitration Rules* by the Secretariat.

Now the case has been finalized. Based on verified facts and evidences as well as applicable laws, the arbitration tribunal has made the final judgment on the case. Facts of the case, opinions of the arbitration tribunal and the award are expatiated respectively as below:

## I. Facts of the Case

(I) Main opinions stated in the Arbitration Application and the items requested for arbitration by the Applicant

In May 2010, the Applicant and the Respondent executed the *Sales Contract* in question, stipulating that the Applicant shall sell solar battery modules to the Respondent. It is stipulated in Clause 7 of the *Sales Contract* that the Respondent shall pay off the money for the goods within 60 days from the departure date of goods as listed on the bill of lading.

On October 23, 2010, the Applicant delivered to the Respondent solar battery modules with the total price of USD646,191 according to the *Sales Contract*. On November 21, 2010, the Applicant delivered again to the Respondent solar battery modules valued USD878,748. After that, the Applicant provided relevant invoices, packing lists and bills of lading of these two batches of goods to the Respondent.

According to the stipulations set out in Clause 7 of the *Sales Contract*, the Respondent shall pay off the total price within 60 days from the departure date as listed on the bill of lading. Therefore, the deadlines for payment of the preceding two batches of goods shall be December 22, 2010 and January 20, 2011 respectively. On the aforesaid deadlines, the Respondent failed to pay the total price according to the stipulations set out in the *Sales Contract*, defaulting on its payment of USD1,372,445.10 in total, which is still overdue now.

In addition, according to the stipulations set out in Clause 9 of the *Sales Contract*, in case the Respondent fails to make full payment in time according to the Contract and thus causes exchange loss to the Applicant, the Respondent shall bear such loss, i.e. in case the exchange rate for USD to RMB of the People's Bank of China on the payment deadline is depreciated in comparison with that on the date when the Respondent actually makes the payment, the exchange loss caused therefrom shall be borne by the Respondent.

Therefore, the Applicant issued Lawyer's Letter to the Respondent on December 19, 2012 and January 24, 2013 respectively, requesting the Respondent to pay off the money overdue. However, by now the Respondent has neither paid off the money nor compensated any loss incurred to the Applicant. The arbitration requests submitted by the Applicant in the Arbitration Application are listed as follows:

1.  To request a judgment on the Respondent paying the two overdue payments for the goods, which are USD1,372,445.10 in total, to the Applicant (the total payment for the first batch of goods is USD646,191, minus the prepayment having been made by the Respondent, the Respondent is still defaulting on its payment of USD581,571.90; the total payment for the second batch is USD878,748, minus the prepayment made by the Respondent, the Respondent is defaulting on its payment of USD790,873.20), that is RMB8,611,407 in total (calculated according to the intermediate conversion price of RMB6.2745 for USD to RMB promulgated by the Bank of China on March 7, 2013);

2.  To request a judgment on the Respondent paying the interest of the overdue payment for the goods mentioned above from the deadline to the actual payment date, temporarily calculated as RMB1,251,930 (wherein the interest of the price of the first batch of goods, as calculated temporarily from the second day (December 23, 2010) following the payment deadline to March 7, 2013, amounts to RMB543,454; the interest of the price of the second batch of goods, as calculated temporarily from the second day (January 21, 2011) following the payment deadline to March 7, 2013, amounts to RMB708,476. The total amount of the interests mentioned above is RMB1,251,930; it is requested to calculate up to the date when the Respondent actually performs the obligation to make the total payment);

3.  To request a judgment on the Respondent compensating the Applicant RMB464,816 for exchange losses caused by overdue payment (wherein the exchange loss of the first payment for the goods is RMB216,403, and that of the second payment for the goods is RMB248,413; it is requested to calculate up to the date when the Respondent actually performs the obligation to make the total payment);

4.  To request a judgment on the Respondent bearing the lawyer's fee of the Applicant, which is in total RMB250,000 (this RMB250,000 is a temporarily calculated amount; in case the lawyer's fee actually paid exceeds RMB250,000, to request a judgment on the Respondent bearing the cost actually paid by the Applicant);

5.  To request a judgment on the Respondent bearing the arbitration cost of this case;

On the first court hearing, the Applicant made modification on the arbitration requests of Item 1 and Item 3 above: for Item 1, to request confirming that price should be calculated in USD; and for Item 3, the request was amended as: to request the judgment on the Respondent compensating the Applicant RMB463,799 for exchange losses caused by overdue payment of the Respondent to the Applicant. As of March 7, 2013, the initial day of exchange rate was moved one day compared to the previous one. The calculation days are December 22, 2010 and January 20, 2011 respectively. Exchange loss is calculated according to the actual payment date of the Respondent.

(II) Defense opinions given by the Respondent on the court hearing and the attorneys' opinions given after the first court hearing

The Respondent gave defense opinions orally in the court hearing, and submitted written attorney's opinions after the first court hearing. Its main opinions are listed as follows:

1.   The Respondent and the Applicant had long-term contract relationship and the two parties had reached agreement on quality standards and warranty period.

The Respondent and the Applicant had long-term contract relationship. On July 7, 2009, the Respondent and the Applicant signed a *Co-Branding Agreement* (referred to as "*Co-Branding Agreement*" hereinafter) for a duration of three years. The two parties stipulated the procurement volume of solar battery modules for each year. According to the stipulations set out in the *Co-Branding Agreement*, the two parties successively signed a series of sales contracts including the *Sales Contract* in question during the three years of effective duration of the contract, and determined model of assemble, quantity, price, time of payment and time of delivery of purchased modules of each batch. It is stipulated in the Purchase Order of the *Co-Branding Agreement*: "Before every contract year starts, parties need to sign on the purchase contract for that period. If during that contract year there are additional orders from buyer, parties may have additional purchase contracts. Both year and additional contracts are as the integral parts of the OEM agreement". Therefore, it can be seen that all sales contracts or orders concluded by and between both parties during the term of validity of the *Co-Branding Agreement* were integral part of the long-term procurement contract. Therefore, the Respondent and the Applicant had long-term and stable transaction relationship. The stipulations in the *Co-Branding Agreement* concerning quality assurance shall apply to products of all batches and models stipulated for procurement between the Respondent and the Applicant.

The two parties stipulated the quality standards and the quality assurance clauses. According to the *CSUN OEM Assembly Inspection Standards Q/CSUN. J27. 0002 V1.0* provided by the Applicant to the Respondent, it is specifically stipulated in the technical requirements of Item 2 No. 2: "color:

the whole battery of assembly shall have even color. Color-jumping on the battery is not allowed"; and technical requirements of Item 3 are "cracks (visually seeable) and debris on battery are not allowed". The aforesaid clauses indicates that the solar battery modules provided by the Applicant should comply with such quality standards as even colors, without cracks or debris, otherwise would be regarded as having defects in materials and workmanship. The clause of Warranty/Defective Products in the *Co-Branding Agreement* stipulates: "For warranty, free from defects in material workmanship: 5 years". The clause indicates that the Applicant guaranteed the products sold to the Respondent would be free from any defect in material or workmanship in 5 years.

In addition, the emails between the Respondent and the Applicant on May 5, 2010 showed that the sales manager of the Applicant sent a quality assurance named "Limited Warranties for Photovoltaic Modules 2010" to the Respondent again. This quality assurance also stipulated that "CSUN warrants its MODULES, including field replaceable DC connectors and cables, to be free from defects in materials and workmanship under normal application, installation, use and service conditions. If MODULES fail to conform to this warranty, for a period ending 60 months from date of sale to the original customer (CUSTOMER) as shown in stamped packing list of CSUN, CSUN will, at its option, either repair, replacement and refund the purchase price as paid by CUSTOMER". It can be seen that the Applicant guaranteed and the Respondent accepted that the Applicant would undertake the quality assurance responsibilities for repair, replacement and refund in 5 years for any defect in material or workmanship in products sold to the Respondent.

2.   The products purchased by the Respondent from the Application have quality defects. The Respondent requested many times the Applicant to bear quality assurance liabilities and obtained no result.

Products in the Contract and the orders in question have quality defects. According to the pictures of the defective modules provided by the Respondent, the modules of the model SSTWB190-72M under the *Sales Contract* have obvious uneven colors and are not in compliance with the quality standards of the modules guaranteed by the Applicant. In addition, according to the Flash Testing Report (S69020043F-2) provided by the Applicant when delivering the goods, it can be confirmed that the model of the defective modules corresponds to that delivered by the Applicant under the *Sales Contract*. Therefore, it can be seen that the products of SSTWB190-72M under the *Sales Contract* have obvious and visible quality defects.

Later, the Respondent engaged authoritative third party testing institution to carry out more detailed testing on the modules of other models delivered by the Applicant. According to the testing

report issued by the third party testing institution Celestica, the modules of the model SSTWB250-60M delivered to the Respondent by the Applicant have visible uneven colors. According to further EL optical testing, clear cracks were found on the modules with snail marks. The conclusion drawn in the final test report is that there are direct relationship between the snail marks and the cracks, and the modules with snail marks would certainly be found with cracks in EL optical testing. While some modules, even though no snail marks were found, have been found with cracks in the summary of EL optical testing.

According to Flash Testing Report S69020043-7A, S69020043-7B and S69020043F-1 (respectively corresponding to PO1578 and PO1559 orders under the contract for S69020043) provided by the Applicant at the time of delivery, it can be determined that the goods delivered by the Applicant under the contract and the orders in question are all modules of SSTWB250-60M.

Models of products with quality defects involved many orders and batches between the Respondent and the Applicant. On December 10, 2010, the Respondent raised quality objections to the Applicant for the first time through Email, aiming at aforesaid defects in materials and workmanship existing in the summary of modules provided, and sent detailed information including models, relevant data and pictures of the modules with quality problems to the Applicant along with the email. On December 14, 2010, the Applicant replied the email, confirming that it had received all the documents related with the quality objection. In the subsequent communications, the sales manager of the Applicant guaranteed to the Respondent to replace the defective modules for the latter, and suggested the Respondent that "no matter what the final negotiation result would be", the Respondent should replace the defective modules for its customers "as soon as possible". Therefore, the Respondent replaced the modules with defects complained by the customers, but failed to receive the substitutes guaranteed by the Applicant. Later, the Respondent received quality complaints from several customers more successively, claiming that several batches of products delivered by the Applicant had aforesaid quality defects of different levels. From the pictures taken on the site, it is clear that solar modules have obvious uneven colors and cracks. On April 28, 2011, the Respondent delivered formal quality complaint to the Applicant. As of that time, the actual loss encountered by the Respondent for replacing defective modules had reached USD2,417,335. Therefore, based on the quality warrants made by the Applicant, the Respondent raised the request for providing substitutes or discounting the price. Later on, the Respondent raised quality complaints to the Applicant again on September 15, 2011 and November 4, 2011 respectively, and attached complaints on quality raised by several customers in succession. Defective products included modules of same model in several batches as well as modules of different models in the same batch.

According to the report provided by the authoritative third party testing institution, the aforesaid quality defects only appear gradually in at least five months after being installed normally outdoors. Therefore, it cannot be excluded that the aforesaid defects would be found in the future in the modules that have been installed. As of April 2011, according to the sampling test carried out by the Respondent on the module systems installed by several customers, the defect rate of uneven colors and cracks in the goods delivered by the Applicant reached as high as 65%. However, up to now, the Applicant has not adopted any remedies for aforesaid quality complaints, idled in performing the quality assurance obligation stipulated in the Contract. The behavior of the Applicant has formed breach of Contract. Whereas the products delivered by the Applicant had wide quality defects, and the scale of defective modules might expand continuously, but the Applicant has neglected in performing the quality warrant obligations stipulated, the Respondent has reasons to consider that the behavior of the Applicant will structure fundamental breach of the long-term procurement contract.

3.   The Respondent is entitled to request the Applicant to adopt remedial measures including repair, replacement or refund according to the quality warrants provided by the latter, and be entitled to request the Applicant to offer discount and providing substitutes according to the *United Nations Convention on Contracts for the International Sale of Goods* (referred to as the "CISG" hereinafter).

According to the quality warrants provided by the Applicant, the Respondent is entitled to request the Applicant replacing the defective goods or giving discounts on the prices. Based on the *Co-Branding Agreement* and CSUN Quality Warrants concluded by both parties, within 60 months after the sale of products, for defects in materials and workmanship in the products delivered by the Applicant, the Respondent will be entitled to request the Applicant for repairing, replacement or refunding. The Respondent's deduction from the contract price not paid based on the requirements of quality warrants of the Applicant is not a breach of contract, but the exercise of right of remedy under the situation of quality not in compliance with that stipulated in the Contract. Moreover, the two parties have stipulated in the sales contracts to apply CISG. According to the stipulations set out in Clause 50 of CISG, in case the goods are not in compliance with contract, no matter whether the payment has been done or not, the Buyer can counteract the price.

The behavior of the Respondent refusing to pay does not form breach of contract. It is stipulated in Clause 81 of CISG that if one party fails to perform its obligations due to act or non-act of the other party, the latter shall not claim the opposite not performing obligations. The evidence submitted by the Respondent showed that the products under the purchase orders not paid under dispute of the case have prominent quality defects. According to the quality warrants from the Applicant, it shall

repair, replace or discount the products with quality defects raised during the quality warranty period. However, by now the Applicant has not repaired the defective products according to the quality warrants or provided substitutes upon the request of the Respondent. Therefore, the Respondent had to deduct the price to be reduced from the money payable for the goods. Because the Applicant failed to perform the quality warrant obligations stipulated in the Contract, which caused the Respondent not able to perform the obligation of paying for the goods, the Applicant should not allege that the Respondent failed to perform obligations or breached the Contract.

The Respondent has suffered actual losses due to incompliance of the products delivered by the Applicant. Because the products provided by the Applicant generally have defects in quality, after the Respondent sold the products to customers and installed and used, it received quality complaints from many customers. As of April 28, 2011, the actual loss suffered by the Respondent for replacing defective modules for its customers had reached USD2,417,335, far beyond the price counteracted by the Respondent from the money payable to the Applicant. Moreover, the complaints from the customers received by the Applicant are far more than these. Until September 15, 2011, many more customers put forward the same quality defects on the products purchased from the Applicants. At present, the amount of loss encountered by the Applicant due to defective products is still expanding. Therefore, the Respondent reserves the right to request the Applicant replacing defective products or refunding according to its quality warrants made.

(III) Attorneys' opinions submitted by the Attorney of the Applicant after appearing on court

Attorney of the Applicant also submitted written attorney's opinions after the first court hearing. The main opinions are as follows:

1. The Respondent refused to pay total price for the goods under the *Sales Contract* involving dispute of the case, and should bear relevant liabilities for the breach of Contract, compensating all losses encountered by the Applicant.

It is stipulated in the *Sales Contract* that the Applicant will sell solar battery modules to the Respondent, and the latter shall undertake relevant payment responsibilities. From September to November 2010, the Respondent purchased two batches of solar battery modules of USD646,191 and USD878,748 respectively from the Applicant under the *Sales Contract*. After receiving 10% prepayment remitted from the Respondent, the Applicant delivered the two batches of solar battery modules purchased by the Respondent on October 23, 2010 and November 21, 2010 respectively. The commercial invoice numbers of the Applicant corresponding to the two deliveries are S69020043-6 and S69020043-7.

The Applicant has performed totally the obligation of delivery under the *Sales Contract*, but the Respondent has failed to perform its payment obligation until today, in total overdue USD1,372,445.10 for the goods. In the first court session, except considering the overdue amount should be USD1,371,525, the Respondent held no objection to the Applicant's assertion mentioned above. Moreover, the Respondent has not provided any evidence by now to provide that its actual overdue amount is USD1,371,525.00

The default behavior of the Respondent has caused the following losses to the Applicant: (1) Payment for the goods overdue under the *Sales Contract*: USD1,372,445.10; (2) Loss of interest: currently calculated until March 7, 2013, loss of interest is RMB1,251,930; (3) Exchange loss: exchange loss caused by overdue payment to the Applicant, currently calculated until March 7, 2013, is RMB463,779. The Respondent failed to pay the total amount to the Applicant according to the stipulations in the Contract. On the date that the Applicant submitted the Arbitration Application and the date of first court session of the case, the exchange rate dropped greatly compared to the exchange rate between USD and RMB promulgated by the Bank of China on the payment deadline for the goods, so exchange loss has been generated to the Applicant. According to the "complete compensation principle" established in Clause 74 of CISG, the Respondent should compensate aforesaid exchange loss encountered by the Applicant. (4) Lawyer's fee: the payment approach for the legal service contract signed by and between the Applicant and its lawyers is conditional fixed top price, which is RMB250,000. As of the last billing date of the lawyers of the Applicant, i.e. September 10, 2013, the Applicant had received a total of the lawyers' bills as much as RMB257,710. Therefore the Applicant requested a judgment on the Respondent bearing the lawyers' fee for the Applicant as much as RMB250,000 in total. If the actually paid amount by the Applicant for the case exceeds RMB250,000, the Applicant reserves the right to request the arbitration tribunal demanding the Respondent make relevant compensation according to the amount actually paid. (5) Arbitration cost: the Applicant has paid RMB225,782 arbitration cost for this case.

2.   The compensation assertion made by the Respondent against the Applicant in the submitted evidence *Claim Letter* on September 14, 2013 has no ground of facts and laws, which shall not be supported by the arbitration tribunal.

In the *Claim Letter* on April 28, 2011, the Respondent alleged that part of solar battery modules delivered by the Applicant had quality defects. However, the Respondent did not mention at all in the letter what kind of defects are those alleged. There is no evidence proving that the defects are found in the solar battery modules sold by the Applicant, and the Respondent failed to provide any

certificate to prove that so-called defects will cause loss to the Respondent as well as the severity of these defects is already on a level of not able to be used and must be replaced, or any certificate showing that these solar battery modules have been actually replaced. Therefore, it can be seen that the Respondent has not provided any evidence to prove that the defects in the goods provided by the Applicant have structured fundamental default against Clause 25 of CISG and thus the Respondent has right to request refund, and also the Respondent has not submitted any evidence proving that the quantity of the defective goods alleged are the number listed in the *Claim Letter*, unit value of defective goods as well as the labor cost actually paid by the Respondent for replacing any solar battery module. The Respondent cannot even prove that the attached *Quality Warrant* is the quality assurance for the goods issued by the Applicant to the Respondent, pertinent to the goods under the *Sales Contract* involving dispute of the case, or the quality assurance pertinent to the goods covered by the *Claim Letter*.

3.    The compensation assertion from the Respondent cannot be put forward in the case as demurrer or counterclaim.

In this case, the Respondent actually alleged relevant liabilities for quality of products, requesting the Applicant to bear relevant legal responsibilities so as to counteract the price payable by the Respondent in this case. However, such assertion of the Respondent should not be put forward in the case as demurrer or counterclaim. The main reasons are as follows:

Quality problems alleged by the Respondent, even according to its assertion, belong to disputes under other contracts apart from the *Sales Contract* of this case and do not fall into the hearing scope of the case; and they shall not be solved by means of demurrer or counterclaim in this case. Therefore, seen from procedure, such assertion and relevant facts from the Respondent should not be heard in this case, and the demurrer should not be accepted, nor the counterclaim.

The claim for compensation raised by the Respondent in terms of so-called quality issues is not pertinent to any of creditor's right due against the Applicant that has been recognized, but pending matter to be recognized through hearing. Therefore, even if it belongs to any dispute of orders under the case, it does not comply with regulations set out in the *Contract Law of the People's Republic of China* (referred to as "*the Contract Law*" hereinafter) in terms of counteraction, cannot be put forward by means of demurrer through counteraction in this case.

Referring to the stipulations set out in Clause 44 of the *Explanations of the Supreme People's Court on Applicable Laws for Hearing Cases Concerning Disputes in Sales Contracts* (referred to as "*Judicial Explanations on Hearing Sales Contracts*" hereinafter), if the Seller requests the Buyer to

pay after performing the oblgiation of delivery, while the Buyer alleges that the Seller shall pay penalty for breach of contract and compensation for loss, etc. with the assertion that the Seller first breaches the contract, counterclaim shall be filed. In this case, the Respondent is obviously not carrying out negative defense, but is actively alleging to the Applicant for payment and further request coutneraction. Positive claims of the Respondent must be put forward by means of counterclaim or prosecution else wise instead of by means of demurrer. In this case, seen from the object level, because the orders based on which the Respondent alleged for the rights are not the orders involved in the case and are not in compliance with conditions set out in China laws concerning counterclaims, it cannot put forward the counterclaim in this case. In terms of procedure, the Respondent has not raised counterclaims during the peirod over half year after the case was accepted for hearing in March 2013, which has exceeded the deadline on submission of counterclaims stipulated in the *Arbitration Rules* and Chenese laws, thus it should not be accepted.

The arbitration tribunal expressed clearly at the first court session that it would not accept the counterclaims raised by the Respondent. In addition, considering that the Respondent had obtained authorization before the opening of the first court session but failed to actively claim for rights, and the Respondent raised jurisdiction objection without any reason on the last day before the first court hearing after extension, expecting to delay the time limit for trial of this case. It cannot be excluded that it is suspected for delaying the trial of the case over and over. Therefore, no matter from the vision of legal regulations or arbitration practice, or from the principles of arbitration efficiency and justice, demurrer or counterclaim raised by the Respondent concerning so-called quality issues should not be accepted for trial.

Based on the aforesaid facts and reasons, the Applicant requests the arbitration tribunal to support the Applicant's claims against the Respondent for paying the balance of the goods and relevant compensations, and requests the Respondent filing litigation or arbitration else wise based on specific contracts.

(IV) Supplementary attorneys' opinions submitted by the Attorneys of the Respondent after the opening of the second court session

The Attorneys of the Respondent submitted supplementary attorneys' opinions after the opening of the second court session. Main opinions are as follows:

1. The fact concerning business cooperation and disputes between the Applicant and the Respondent.

On July 7, 2009, the two parties signed *Co-Branding Agreement*. On the same day, the two parties signed *Sales Contract No. S60100*, which specifies the models and the quantity of PV modules to be purchased. On March 1, 2010, the two parties signed *Sales Contract No. S69020036*. On April 9, 2010, the two parties signed *Sales Contract No. S69020042*. On May 5, 2010, the Applicant sent Quality Warranty to the Respondent through email. On May 17, 2010, the two parties signed the *Sales Contract* involved in this case. On June 17, 2010, the two parties signed *Sales Contract No. S69020045*.

In December 2010, the Respondent received complaints from the customer that the PV modules produced by the Applicant that had been sold by the Respondent to the customer had quality problems. Through field inspection, the Respondent verified the defects of the PV modules, and raised objection on quality to the Applicant through email on December 10, 2010, and provided data and pictures related with the defective modules by means of attachments to the email. Through communication between the two parties, on January 6, 2011, Sally Fan, the sales manager of the Applicant proposed that no matter what the result of negotiation would be, the Respondent should replace defective modules for its customers as soon as possible. The Respondent then replaced the modules with defects in workmanship according to the requirements of the customer Mongolia Energy on January 19, 2011.

On January 26, 2011, the Respondent raised again quality objection to the Applicant through email and attached the pictures of the defective modules. From April 3, 2011 to April 14, 2011, the Respondent raised quality objection to the Applicant through email again, and provided the result of sampling testing. The defect rate of PV modules had reached 65%.

From April 19, 2011 to April 28, 2011, as urged by the Respondent, the Applicant dispatched relevant staff Lester (Wang Xinglei) to the U. S. to learn the circumstances of quality problems of the PV modules at the Respondent's. After the Applicant carried out field inspection, the Respondent issued formal Claim Letter to the Applicant on April 28, 2011. However, the Applicant had never given a solution. The Respondent put forward quality objection many times to the Applicant on September 15, 2011 and November 4, 2011 successively, requesting the Applicant to perform the quality warrant obligations according to the Quality Warranty, and to replace the PV modules with defects, but it never received effective response from the Applicant. It can be seen that the Respondent has always been raising quality objection to the Applicant, requesting the latter to bear the obligation of quality warrants, instead of defaulting on payment deliberately.

2.   The *Sales Contract* of this case refers to a certain batch in the contracts of delivery in batches.

The business cooperation between the Respondent and the Applicant started from the *Co-Branding Agreement*, through which the two parties decided the cooperation matters of using joint logo on the PV modules as well as the total purchasing quantity in the subsequent three years. In addition, based on the *Co-Branding Agreement*, the two parties have signed successively a series of sales contracts to determine specific models and quantities of PV modules to be purchased every time.

It can be seen that the cooperation purpose determined in the *Co-Branding Agreement* is realized through the performance of a series sales contracts. Therefore, the *Sales Contract* in this case is not an independent contract. All the contracts signed by and between the Applicant and the Respondent from July 7, 2009, including the *Sales Contract* in this case shall be deemed as a whole part, subject to the regulations set out in CISG concerning the contracts of deliveries in batches.

3.   The Applicant shall bear quality assurance liabilities for the PV modules sold to the Respondent.

The Applicant denied over and over the existence of the Quality Warranty in court hearing, and considered that even it exists, the defects alleged by the Respondent would not affect the normal use of the PV modules, so the PV modules do not have quality defects. Therefore, the Respondent considers that: first of all, in terms of the evidences provided by the Applicant and the commercial conventions of international trade, the Quality Warranty exists objectively. The Respondent and the Applicant have long-term contract relationship for selling and buying PV modules. Whereas the characteristics of the products of PV modules, it is impossible that the two parties have no stipulations on quality warrant. In fact, it has been mentioned in the 3rd paragraph of the lawyer's letter sent by the Attorney of the Applicant to the Respondent on January 24, 2013: "*please note that the general warranty issued by CEEG does not cover incidentals such as your labor costs.*" Therefore, the Attorneys of the Applicant are well aware of the fact that the Quality Warranty exits and also the details of the Quality Warranty. Secondly, the Quality Warranty of the Applicant applies to the PV modules of all the models that it produces. The Respondent has submitted two copies of Quality Warranty obtained from the Applicant on open court session. Although the issuers of these two Quality Warranties are the Applicant CEEG and the parent company of the Respondent CSUN respectively, the main contents of these two documents are the same, guaranteeing a five-year warranty for defects in materials and workmanship generated from the modules. Moreover, in the *Co-Branding Agreement* signed by the two parties, the Applicant also guaranteed the scope and the term of quality warrants in consistency with the Quality Warranty. The Quality Warranty provided by the Applicant applies to the PV modules of all models that it produces. Besides, cracks and snail

marks appearing on the PV modules are within the scope of warrant for defects in materials and workmanship in the Quality Warranty. The Quality Warranty provided by the Applicant includes two parts: one is the warranty on defects in materials and workmanship and the other is that for power output. The inspection standards for modules provided by the Respondent specifically requests that the surface color of the PV module battery shall be even and consistent, and should not have any crack. The appearance of snail mark and crack is a type of defect in material and workmanship. No matter whether the crack or snail mark affects the power output of PV modules or not, according to the Applicant's commitments made in the Quality Warranty, the Applicant shall perform the quality assurance obligations for the defects in materials and workmanship. When quality problem occurred to the products, the Applicant adopted delay and avoiding attitude for handling the issues, which obviously formed breach of Contract. At last, the testing report from Celestica is authoritative. Celestica Lab is authorized by TUV Rheinland Laboratory, being a professional institution that provides test authentication services for PV modules, and TUV Rheinland Laboratory is the testing organization determined in the Quality Warranty provided by the Applicant. Therefore, the test result on PV modules carried out by Celestica Lab and TUV Rheinland Laboratory possess the same authority.

4.    The assertion of the Respondent for remedies, including requesting the Applicant to reduce the price with the reason of existence of quality defects, is a demurrer. According to stipulations set out in Clause 44 of *Judicial Explanations on Hearing Sales Contracts* promulgated by the Supreme People's Court of China, "in case the Seller requests the Buyer making payment after performing the delivery obligations, while the Buyer raises objection with the reason that the Seller has breached the contract first, the People's Court shall handle repsectively according to the following situations: (I) it is deemed as demurrer if the Buyer refuses to pay penalty for the breach or refuses to compensate for losses or argues that the Seller shall adopt remedial measures such as offering discounts; (II) in case the Buyer argues that the Seller shall pay penalty for the breach and compensate for loss, or requests cancellation of the Contract, it shall raise counterclaim", the assertion of the Respondent requesting a reduce of price due to the defects existing in the Applicant's products in this case is a demurrer instead of a counterclaim.

5.    The Respondent shall not bear any default liability for the payment not made for the goods. The Applicant failed to perform the obligation of quality warranty in the first place, which led to the Respondent's deducting from the payment not made for the goods in order to compensate for the losses caused by defective products. According to the stipulations set out in Clause 80 of CISG, the Applicant shall not argue that the Respondent has failed to perform the obligations set out in the

contract or has breached the contract. Therefore, the Respondent shall not bear any default liability due to interest loss and exchange loss caused by the Respondent's not paying for the goods.

(V) Supplementary attorneys' opinions submitted by the Attorneys of the Applicant after the opening of the second court session

Aiming at the supplementary attorneys' opinions submitted by the Respondent, the Applicant also submitted supplementary attorney's opinions in written form. Its main opinions are as follows:

(1) The *Sales Contract* in question is completely independent from the *Co-Branding Agreement*. There is no correlation between the two. First of all, the Respondent fails to provide the original copy of the *Co-Branding Agreement*, thus the Applicant does not recognize the authenticity of the *Co-Branding Agreement*. Secondly, the *Co-Branding Agreement* has no relation with the *Sales Contract* in question apparently. There is no mutual reference or quoting of any content in both, thus it cannot be concluded that these two documents have any relation. In addition, the clauses in the *Co-Branding Agreement* are self-contradictory, and they have many contradictions with the clauses in the *Sales Contract*. The actual transactions between the two parties in 2010, including types, quantities of deliveries and payment terms were not executed according to the *Co-Branding Agreement*. For example, the actual payment term under the *Sales Contract* between the two parties is: the Buyer shall make the prepayment of 10% before the delivery, and it shall pay off the 90% balance within 60 days following the departure of the goods; rather than either of that stipulated in the *Co-Branding Agreement* "20% as prepayment, and 80% balance to be paid off within 10 days" or "100% total amount to be paid off within 3 months". Therefore, this case has no relation with the *Co-Branding Agreement* and it cannot be concluded that the *Sales Contract* refers to a certain batch under the *Co-Branding Agreement*.

2. The two copies of *Quality Warranty* mentioned by the Respondent are not authentic; they cannot be taken as the basis to confirm the facts of this case. The Respondent considers that the main basis for the stipulations on warranty of quality between two parties is these two *Quality Warranty* submitted to the arbitration tribunal successively. However, as for the first *Quality Warranty* (i.e. "Limited Warranty for PV Modules") on which there is no signature or seal affixed by either party, the source is not clear. As for the second *Quality Warranty* (i.e. "Limited Warranty for Photovoltaic Modules 2010"), there is no seal or signature affixed by the Applicant, and the issuer is China Sunergy (Nanjing) Co., Ltd., which is not the Applicant, thus it is not related to this case. Therefore, the Applicant does not recognize the authenticity of these two copies of so-called *Quality Warranty*. The assertion of the Respondent on quality issues based on such *Quality Warranty* shall not be

admitted.

3.   Testing report issued by Celestica is not authoritative. In case the Respondent considers that the quality does not comply with the stipulations set out in the Contract, it may apply for judicial authentication. The Respondent put forward in its Attorneys' opinions that Celestica Lab is an authority under the authorization of TUV Rheinland Laboratory, but did not provide any evidence. In fact, the Respondent can actually apply for judicial authentication on the quality issues of the projects in dispute between both parties instead of only providing a testing report issued by an organization entrusted by itself.

4.   The judgment scope of arbitration of this case shall only be restricted to the dispute over the payment for the goods argued by the Applicant. In case the Respondent argues for compensation for quality defects, it shall raise counterclaim or file a petition else wise. First of all, the assertion of the Respondent on reducing the price based on *Judicial Explanations on Hearing Sales Contracts* is a demurrer rather than a counterclaim. However, such basis belongs to the judicial explanations made by the Supreme Court of China, only applicable to the hearing of litigations of the People's Court on all subordinated levels, but not for the arbitration of this case. Secondly, the Respondent's argument for quality issues is mainly based on the *Quality Warranty* that it submitted as evidence, but it is stipulated exactly in Clause 5 of the Quality Warranty that in case any dispute arises between the quality warrantor and the buyer, it shall be submitted to the court having the jurisdiction in Nanjing City, China for trial. Therefore, the arbitration tribunal does not have jurisdiction over the dispute arising from the Quality Warranty between the two parties currently. The Respondent shall file a lawsuit to the People's Court having jurisdiction in Nanjing else wise. Thirdly, in this case the Respondent has not put forward any counterclaim arguing for compensation for quality defects. If the arbitration committee judges on relevant dispute over quality, it will be regarded as typical super-judgment. Therefore, the arbitration of the case shall only be limited to the dispute on the payment for the goods argued by the Applicant, and shall not involve quality dispute. Certainly, this will not affect any material rights and interests of the Respondent. If the Respondent intends to argue for the compensation liabilities based on quality issues, it may file a lawsuit else wise to protect its legal rights and interests.

## II.   Opinions of the Arbitration Tribunal

(I)   Law application in this case

The subject matters in the transaction signed by the parties of this case are PV modules. The transaction crosses borders, and the *Sales Contract* in question is an international goods sales

contract. The business premises of the Applicant are located in China, while those of the Respondent are in the USA. Both business premises are located in the members of CISG. It is stipulated in Clause 15 of the *Sales Contract*: "……proper law is the *United Nations Convention on Contracts for the International Sale of Goods*"; both parties quoted relevant contents in China laws and judicial explanations from the court as basis. Therefore, the arbitration tribunal considers that the stipulations set out in CISG shall apply to solve the disputes under the *Sales Contract* of the case, and the China laws shall apply to the issues that have not been covered in CISG.

(II) Effectiveness of the *Sales Contract* in question

According to the stipulations set out in Clause 4 of CISG: "CISG only applies to the conclusion of sales contract and rights and obligations generated by such contract between the seller and the buyer. In particular: unless otherwise specified, CISG has nothing to do with the following matters: (a) effectiveness of the contract or effectiveness of any clause or effectiveness of any convention; ……" Therefore, as for the effectiveness of the *Sales Contract* in question, China laws shall be applied to judgment.

The arbitration tribunal has noticed that the *Sales Contract* under this case has the official seal of the Applicant and signature of the authorized representative of the Respondent, being the true reflection of both parties' will. Neither party holds objection on the effectiveness of the contract during the arbitration process, and the arbitration tribunal has not found any conflicts between the contents of the Contract and the enforceable regulations in applicable laws and administrative laws of China concerning effectiveness of contracts and thus led to the result of invalid contract. According to stipulations set out in Clause 32 of the *Contract Law* concerning "if the parties adopt the form of contract to execute the contract, the contract will enter into force upon signatures or seals of both parties" as well as in Clause 44 of such law concerning "the contract established according to laws will enter into force at the time of effectiveness", the arbitration tribunal considers that the contract involving dispute under this case has been established and validated, having legal binding force on both parties. Both parties shall strictly follow the stipulations set out in the contract and relevant laws and regulations to perform obligations, argue for rights and bear responsibilities.

(III) Facts verified by the arbitration tribunal

The arbitration tribunal has reviewed the evidence materials submitted by both parties, and also heard the presentation made by both parties on performance of the *Sales Contract*. Based on opinions of proof and cross-examinations of both parties, the following facts have been verified:

The Applicant and the Respondent signed the *Sales Contract* in Shanghai on May 14, 2010. It is stipulated in the Contract that the Applicant (the Seller) will sell solar battery modules to the Respondent (the Buyer). The Contract has stipulated transportation of goods, delivery, payment, exchange rate risks, inspection and claim, etc.

After the aforesaid Contract was signed, the Respondent paid USD64,619.10 as the prepayment for the goods to the Applicant on October 8, 2010. The Applicant delivered solar battery modules with a total value of USD646,191.00 to the Respondent on October 23, 2010. The Respondent paid USD87,874.80 as prepayment to the Applicant on November 9, 2010, and the Applicant delivered solar battery modules with a total value of USD878,748.00 to the Respondent on November 21, 2010.

After that, the Respondent failed to pay the 90% outstanding for the two batches of goods above to the Applicant according to the stipulations set out in Clause 7 of the *Sales Contract:* "payment for the goods: payment collection within 60 days after the departure date as listed on the bill of lading". The Respondent still owes USD1,372,445.10 of the goods payment to the Applicant.

(III)   Focus of dispute of the case

Based on aforesaid facts and opinions of both parties, the arbitration tribunal hereby gives the following opinions on the focus of dispute of the case and the basic opinions of the arbitration tribunal:

1.   Whether the defense claim of the Respondent requesting the Applicant to reduce the price of the goods with the reason of quality defects in the goods is within the scope of trial of the case, and whether the pleading shall be proposed else wise.

The arbitration tribunal has noticed that the Respondent did not raise counterclaim on the arbitration during the period stipulated in the *Arbitration Rules*. However, it pointed out that the goods delivered by the Applicant have quality defects in the demurrer opinions, and further raised the defense claim on reducing the price.

The Applicant considers that the trial scope of the arbitration tribunal shall only be restricted to the dispute over the goods payment argued by the Applicant rather than to involve quality dispute. As for assertion on compensation based on quality defects, the Respondent shall raise arbitration counterclaim or file a lawsuit else wise. The Respondent holds that its claim for remedies including requesting the Applicant to reduce the price with the reason of quality defects is a demurrer instead of a counterclaim.

The arbitration tribunal considers that the precondition to make judgment on the nature of the Respondent's assertion on requesting the Applicant to reduce the price with the reason of quality defects in the goods is to determine the regulations of proper law of the *Sales Contract* under the case concerning relevant problems. It has been recognized in the preceding opinions by the arbitration tribunal that CISG shall apply to the settlement of disputes under the *Sales Contract* under the case, and Chinese laws shall apply to the matters not specified in CISG. The arbitration tribunal has also noticed that CISG has not stipulated that if the claim for discount by the buyer in international sales contract concerning quality of goods is its exercise of pleading right to counterclaim; and the *Contract Law* has not made relevant regulations on such problem. However, both parties have quoted the stipulations set out in Clause 44 of *Judicial Explanations on Hearing Sales Contracts* issued by the Supreme People's Court of China, "in case the Seller requests the Buyer to make payment after performing the delivery obligations, while the Buyer raises objection with the reason that the Seller has breached the contract in the first place, the People's Court shall handle according to the following situations respectively: (I) it is deemed as a demurrer if the Buyer refuses to pay penalty for the breach, refuses to compensate for losses or argues that the Seller shall adopt remedial measures such as offering discounts; (II) if the Buyer argues that the Seller shall pay penalty for the breach, compensate for loss or requests cancellation of the Contract, it shall raise counterclaim", such regulations can be legal bassif for considering relevant problems of the case by the arbitration tribunal. Current materials of the case have shown that the stipulations set out in Item (1) of Clause 44 of *Judicial Explanations on Hearing Sales Contracts* shall apply to the claim of the Respondent as the buyer to reduce the price based on the quality defects of the goods, to be raised by means of defense, not necessarily by means of counterclaim.

2.   Affirmation of relevant default liabilities of the Applicant and the Respondent under the *Sales Contract* in question during the performance of the Contract

It can be seen from the facts verified by the arbitration tribunal that after receiving the 10% prepayment remitted by the Respondent for each of the two batches, the Applicant of the case delivered two batches of solar battery modules under the *Sales Contract* to the Respondent within the period stipulated in the Contract. The Applicant has performed the obligation of delivery under the Contract, while the Respondent has not performed the obligation of payment under the Contract by now.

However, the Respondent alleges that the products from the Applicant have quality defects in its defense. According to the quality warranty of the Applicant and the stipulations in CISG, the

Respondent shall be entitled to request the Applicant to replace the defective products or to refund. The Applicant slighted in performing the quality warranty obligations, which led to the Respondent's deducting the money payable for the goods in order to compensate for the losses caused by the defective products. At the same time, because the Applicant failed to perform the stipulated obligations on quality warranty, it made the Respondent not able to perform the obligation of paying for the goods. The behavior of the Applicant has constituted material breach to the *Co-Branding Agreement* signed by and between the Applicant and the Respondent.

The arbitration tribunal has noticed that the Respondent alleged that the Applicant and the Respondent have reached agreement in the signed *Co-Branding Agreement* concerning quality standards and warranty period. The quality warranty provided by the Applicant to the Respondent applies to the PV modules of all models that produced by the Applicant. However according to the testing report issued by Celestica Lab, a third party authoritative testing organ hired by the Respondent after testing the goods delivered by the Applicant, the products delivered by the Applicant to the Respondent have a lot of serious quality problems. However, besides denying the authenticity of the *Co-Branding Agreement* and the *Quality Warranty* provided by the Respondent as well as the authority of the testing report issued by Celestica, the Applicant also pointed out that the *Co-Branding Agreement* has no relation with the *Sales Contract* in question under the case, and relevant clauses therein shall not apply to this case.

After inspecting relevant evidences, the arbitration tribunal decides that the reason that serious quality problems in the goods submitted by the Applicant as alleged by the Respondent in its defense cannot stand. The reasons are listed as follows:

Firstly, the arbitration tribunal has noticed that it is stipulated in Item (6), Clause 2 of the *Sales Contract*: "to use associated trademark and packaging information of LUMOS and CSUN". The associated trademark mentioned in this clause shall fall within the domain of "trademarks" involved in the *Co-Branding Agreement* which is argued by the Respondent. However, after analyzing the contract clauses in the *Sales Contract* and the *Co-Branding Agreement* respectively, the arbitration tribunal holds that the two contracts are not consistent in terms of such important clauses as quantity, delivery, payment of the contractual subject matters. The two contracts are independent, each binding rights and obligations of different contractual subject matters. It cannot be concluded that the *Sales Contract* refers to a contract for a certain batch under the *Co-Branding Agreement*, which is claimed by the Respondent. Therefore, the stipulations concerning quality assurance and warranty period under the *Co-Branding Agreement* quoted by the Respondent have no binding force on the *Sales*

*Contract* in question under the case. Moreover, the basis of jurisdiction obtained by the arbitration tribunal is the arbitration clauses reached by the two parties in the *Sales Contract*. The *Co-Branding Agreement* do not fall within the scope of trial of this case.

Secondly, the Respondent alleged that according to the *Quality Warranty* that it submitted, the products under the *Sales Contract* by the Applicant have serious quality problems. The arbitration tribunal has noticed that the Respondent submitted the *Quality Warranty* as evidence, but the Applicant did not recognize the authenticity of such evidence. However, the Attorneys of the Applicant mentioned quality warranty in the letter to the Respondent on January 24, 2013. Under the precondition that the Applicant failed to submit rebuttal evidence, the Applicant's objection to the authenticity of such *Quality Warranty* cannot stand. The arbitration tribunal reviewed the contents in the *Quality Warranty*. It can be seen from the text of the *Quality Warranty* submitted by the Respondent that the 5-year quality warranty guaranteed therein is aiming at the consumers, not involved in the defense claim of the Respondent requesting discounting in the case. In addition, it has been stipulated in the *Quality Warranty* that any dispute between the quality warrantor and the buyer shall be submitted to the court having jurisdiction in Nanjing City, China for trial. Therefore, the arbitration tribunal does not have jurisdiction over the disputes arising from the *Quality Warranty*. For disputes under the *Quality Warranty*, the parties may seek for juridical remedy from the People's Court having the jurisdiction.

Thirdly, the *Sales Contract* signed by the two parties has not stipulated the testing organ for the quality of goods. According to the facts verified via current evidences, before engaging the third party testing organ Celestica Lab to carry out testing on the goods provided by the Applicant, the Respondent did not inform the Applicant of the relevant information of the testing organ nor acquire the consent of the Applicant, and the Applicant raised the objection that whether the test samples involved in the testing report were at the delivery status during the performance of the contract in question. Considering that the testing report was made after the Applicant requested for arbitration, already over three years from the delivery period under the Contract, it is difficult for the arbitration tribunal to judge that the goods delivered by the Applicant have quality problems simply on the basis of such report.

In consideration of the preceding reasons, the arbitration tribunal will not admit the opinions of the Respondent alleging that the goods delivered by the Applicant have serious quality problems. According to current evidences and the verified facts, the arbitration tribunal considers that the Applicant of the case has performed the obligation of delivering the goods under the *Sales Contract*.

The Respondent has not provided sufficient and reasonable evidence to prove that such performance has any fault or improperness, and the Respondent has not performed the payment obligation under the Contract, which has constituted breach of Contract, and shall bear relevant default liabilities.

(IV)  About the Applicant's arbitration request

1.   Concerning the arbitration request on the Respondent to make the outstanding payment for the two batches of goods to the Applicant

The arbitration tribunal has already decided in the preceding opinions that under the situation that the Applicant has performed the obligation of delivering the goods under the *Sales Contract*, the Respondent is obliged to pay for all the goods to the Applicant. According to the stipulations set out in Clause 62 of CISG: "the seller may request the buyer to pay the price, collect goods or perform other obligations, unless the seller has adopted some remedial method contradictory to such request", the tribunal supports such arbitration request raised by the Applicant. The arbitration tribunal has noticed that as for the amount of the payment for the goods, the Respondent put forward in the defense that it should be USD1,371,525, which is slightly different from the outstanding payment for the goods argued by the Applicant. However, the Respondent has not submitted any evidence to support its claim on the amount of the payment for the goods. After reviewing and verifying the evidence materials submitted by both parties, the arbitration tribunal determined that the outstanding amount payable by the Respondent should be USD1,372,445.10.

2.   Arbitration request on the loss of interest

The Applicant requests the judgment on the Respondent to pay the interest of the money payable from the deadline to the actual payment date to the Applicant, temporarily calculated as RMB1,251,930 (wherein the interest of the price of the first batch of goods, from the second day of the payment deadline, i.e. December 23, 2010 to March 7, 2013, equals to RMB543,454, as calculated temporarily; the interest of the price of the second batch of goods, from the second day of the payment deadline, i.e. January 21, 2011 to March 7, 2013, equals to RMB708,476, as calculated temporarily. The total amount of the interests mentioned above is RMB1,251,930; it is requested to calculate up to the date when the Respondent actually performs the obligation of the total payment).

The Respondent's defaulting on the payment has constituted breach of Contract, and shall bear the default liabilities for its default. According to the stipulations set out in Clause 78 of CISG, "in case one party fails to pay the price or any other outstanding amount, the other party will be entitled to charge interest on such amount, but shall not obstruct the damage indemnification that can be

obtained according to the stipulations set out in Clause 74", the arbitration tribunal considers that the Applicant's arbitration request on the Respondent to pay interest loss has legal grounds.

The arbitration tribunal has also noticed that it is stipulated in the *Sales Contract* that the Respondent should pay off the money for the goods within 60 days from the departure date of goods as listed on the bill of lading. Therefore, whereas the delivery dates of the two batches of goods were October 23, 2010 and November 21, 2010 respectively, the payment deadlines should be December 22, 2010 and January 20, 2011 respectively. The Applicant claimed that the value date of interest of the first batch of goods is the second day of the payment deadline, i.e. December 23, 2010, and the value date of interest of the second batch of goods is January 21, 2011, the arbitration tribunal admits such value dates. However, the arbitration tribunal considers that in the first arbitration request that the Applicant has clarified that the two payments should be calculated in USD, it claimed to calculate the loss of interest according to the exchange rate of conversion between USD and RMB and the RMB loan interest rate issued by the People's Bank of China. Such claim on interest has mistakes, and the tribunal does not admit it. Referring to the conditions of loans in USD during the performance period of the *Sales Contract* in question, the arbitration tribunal judges to calculate the interest of the preceding two payments as of March 7, 2013 according to the annual interest rate of 2.53%, that is USD74,991 in total.

In general, the arbitration tribunal judges that the Respondent shall pay the interest for the overdue payment to the Applicant as much as USD74,991, along with the interest for the overdue payment calculated from March 8, 2013 to the actual payment date with the annual interest rate as 2.53% and the principal as USD1,372,445.10.

3.   Arbitration request concerning exchange loss

The Applicant requests the judgment on the Respondent to pay the exchange loss incurred to the Applicant due to overdue payment as much as RMB464,816 (wherein the exchange loss of the first payment for the goods is RMB216,403, and that of the second payment for the goods is RMB248,413; it is requested to calculate up to the date when the Respondent actually performs the obligation of the total payment ).

The arbitration tribunal noticed that it is stipulated in Clause 9 of the *Sales Contract*, in case the settlement currency under the Contract is USD or EUR, and the Buyer fails to pay in time according to the Contract, the exchange rate risk loss incurred to the Seller shall be borne by the Buyer. That is to say, in case the USD or EUR against RMB depreciates at the actual delayed payment time of the Buyer according to the official exchange rate for USD or EUR to RMB promulgated by the Bank of

China, compared with the official rates at the time when the payment should be made available by the Buyer according to the contract, the loss incurred thereby to the Seller shall be borne by the Buyer", therefore, the arbitration tribunal supports the request on the exchange loss incurred to the Applicant due to the overdue payment of the Respondent. According to the preceding recognition of the tribunal, the amount of first payment owed by the Respondent is USD581,571.90, which should be paid before December 22, 2010; the second payment is USD790,873.20, which should be paid before January 20, 2011. After consulting relevant data of exchange rates for USD to RMB from the Bank of China, the arbitration tribunal has recognized the calculation method for the Applicant's exchange loss. The amount of exchange loss to be paid shall be: (1) The first goods payment is USD581,571.90; calculated in accordance with the difference between the exchange rate for USD to RMB promulgated by the Bank of China one day before the judgment is made as well as the conversion price of Bank of China, i.e. 6.6466 on December 23, 2010, the exchange loss is RMB287,878.09; (2) The second payment for the goods is USD790,873.20; calculated in accordance with the difference between the exchange rate for USD to RMB promulgated by the Bank of China one day before the judgment is made as well as the conversion price of Bank of China, i.e. 6.5886 on January 21, 2011, the exchange loss is RMB345,611.58.

4.  About the arbitration request on the lawyer's fee

Whereas the dispute of the case arises from the Respondent's breach of contract, considering the support degree of the Applicant's request in the arbitration, according to the stipulations set out in Item (II) of Clause 47 of the *Arbitration Rules*, that "the arbitration tribunal has the right to judge in the award that the losing party shall compensate the winning party reasonable expenses generated in the winning party's handling the case according to the specific situation of the case", the Respondent shall compensate the Applicant the lawyer's fee paid by the Applicant for the case. The tribunal judges that the Respondent shall compensate the Applicant RMB230,000 as the lawyer's fee.

5.  About the undertaking of the arbitration cost in the case

Considering such factors as the support degree of the Applicant's request in the arbitration and the reasons that caused the disputes under the case, the arbitration tribunal judges that the Applicant shall bear 10% of the arbitration cost in the case, while the Respondent shall bear 90%.

### III. Award

The Award made by the arbitration tribunal is shown as follows:

(I)  The Respondent shall pay the Applicant two outstanding payments for the goods, which is

USD1,372,445.10 in total;

(II) The Respondent shall pay the interest for the overdue payment to the Applicant as much as USD74,991, along with the interest for the overdue payment calculated from March 8, 2013 to the actual payment date with the annual interest rate as 2.53% and the principal as USD1,372,445.10.

(III) The Respondent shall pay the Applicant RMB633,489.67 as the exchange loss caused by the Respondent's overdue payment.

(IV) The Respondent shall compensate the Applicant RMB230,000 as the lawyer's fee paid by the Applicant for the case;

(V) The arbitration cost of the case is RMB225,782; the Applicant shall bear 10%, i.e. RMB22,578.20, and the Respondent shall bear 90%, i.e. RMB203,203.80. Whereas the Applicant has fully prepaid the arbitration cost, the Respondent shall pay the Applicant RMB203,203.80;

The payments involved in Item (I), (II), (III), (IV) and (V) of the Award shall be paid by the Respondent to the Applicant in a lump sum within 15 days from the date when the Award enters into force.

The Award is final and enters into force on the date of issuance.



(No text on this page)

Chief Arbitrator: Liu Xiaohong (Signature)

Arbitrator: Chen Gang (Signature)

Arbitrator: Liu Ying (Signature)

Shanghai, June 13, 2014

[With the seal of Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center)]



# **SHIAC**

Shanghai International Economic and Trade Arbitration Commission (Shanghai International

Arbitration Center)



Translation

## NOTARIAL CERTIFICATE

(2014)H.D. Z.W.J.Z.No.2035

Applicant:

CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile: No. 5999, Guangfulin Rd., Songjiang District, Shanghai

Legal Representative: LU Tingxiu, male, Citizen ID No.: 321124196105293532

Entrusted Agent: ZHENG Lulu, female, Citizen ID No.: 342622198712111903

Notarized Matter: Arbitral Award

This is to certify that the foregoing document is a true copy of the original Arbitral Award issued to CEEG (Shanghai) Solar Science & Technology Co., Ltd. by Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center) on June 13, 2014 and the original copy is genuine.

YE Guojian (Seal)
Notary Public

The People's Republic of China
Shanghai Oriental Notary Public Office
         (Seal)

October 9, 2014

# 公　证　书

(2014)沪东证外经字第 2036 号

　　申请人：中电电气（上海）太阳能科技有限公司
　　　　　　住所：上海市松江区广富林路五九九九号
　　　　　　法定代表人：陆廷秀，男，公民身份号码：
　　　　　　　　　　　　321124196105293532
　　　　　　委托代理人：郑露露，女，公民身份号码：
　　　　　　　　　　　　342622198712111903

　　公证事项：译文与原本相符
　　兹证明前面的英文译本内容与中电电气（上海）太
阳能科技有限公司的(2014)沪东证外经字第 2035 号公
证书中文原本相符。

中华人民共和国上海市东方公证处

公　证　员　



二〇一四年十月九日

Translation

## NOTARIAL CERTIFICATE

(2014)H.D. Z.W.J.Z.No.2036

Applicant:

CEEG (Shanghai) Solar Science & Technology Co., Ltd.

Domicile: No. 5999, Guangfulin Rd., Songjiang District, Shanghai

Legal Representative: LU Tingxiu, male, Citizen ID No.: 321124196105293532

Entrusted Agent: ZHENG Lulu, female, Citizen ID No.: 342622198712111903

Notarized Matter: True and Faithful Translation

This is to certify that the foregoing English translation is true and faithful to the original (2014)H.D.Z.W.J.Z.No.2035 Chinese Notarial Certificate for CEEG (Shanghai) Solar Science & Technology Co., Ltd..

YE Guojian (Seal)
Notary Public

The People's Republic of China
Shanghai Oriental Notary Public Office
(Seal)

October 9, 2014



认 字 第 14032231-1 号

兹证明前面文书上公证处的印
章和公证员　叶国建　　的签名
（印章）属实。

中华人民共和国外交部（ 310 ）
2014 年 10 月 09 日　上海

3318159

Consulate General of the )
United States of America )　　　SS;
in Shanghai, China　　　 )

I,　　　　　　　　　　　　 Consul of the
United States of America at Shanghai, China duly
commissioned and qualified do hereby certify that
subscribed above was on Oct. 9, 2014 the date
hereof, an officer of the Foreign Affairs Office
of the　Shanghai　People's Government,
duly commissioned and qualified, to whose official
acts full faith and credit are due. For the contents
of this document I assume no responsibility.

Zhang, Ying

IN WITNESS WHEREOF I have hereonto set my hand
and affixed the seal of the United States Consulate
General at Shanghai, China, this　14th day of
Oct., 2014.

Vice Consul of the
United States of America

American Consulate General
Shanghai China

PRESIDENTIAL COMMISSIONS DO NOT EXPIRE