IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.  14-cv-03118-WYD-MEH

CEEG (Shanghai) SOLAR SCIENCE & TECHNOLOGY CO., LTD.,

     Plaintiff,

v.

LUMOS LLC, now known as LUMOS SOLAR LLC,

     Defendant.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

    THIS MATTER comes before the Court on a petition by a Chinese company,

CEEG Solar Science & Technology Company, LTD ("CEEG"), to enforce a foreign

arbitration award by the China International Economic and Trade Arbitration

Commission ("CIETAC") that was entered against Defendant Lumos LLC ("Lumos"), a

company founded in Boulder, Colorado.  (ECF No. 2).  Lumos has filed a motion to

dismiss the petition.  (ECF No. 22).  After hearing argument from the parties at a

hearing held on May 27, 2015 and carefully reviewing the parties' submissions, I find

that the petition is denied, the motion to dismiss is granted, and this case is dismissed.

II.    <u>BACKGROUND</u>

    By way of background, Scott Franklin is the President and CEO of Lumos, which

was founded in Boulder, Colorado in 2007.  Franklin appeared in person and testified at

the May 27, 2015 hearing.  Lumos provides solar energy products to consumers.

CEEG is a Chinese company based in Shanghai that develops solar panel products.

Co-Branding Agreement

On June 29, 2009, Lumos and CEEG entered into a Co-Branding Agreement where Lumos agreed to buy and CEEG contracted to sell certain solar technology products for a period of three years.  (ECF No. 22-2).  Pursuant to the Co-Branding Agreement, Lumos agreed to order a minimum number of CEEG products over a three-year period.  The Co-Branding Agreement sets forth various terms including pricing, payment, packaging, and delivery.  With respect to "Prices," the Co-Branding Agreement provides that the "[t]he price to be paid by LUMOS to CEEG[] for the Product refers to individual contracts."  (ECF No. 22-2).  The Co-Branding Agreement also provides that "[t]he Seller warrants that all goods delivered conform in respect of quality, specification and packaging, with the stipulations in each contract, relying on datasheets of the goods and all other specifications between the two parties in written form."  (ECF No. 22-2).

Importantly, under the Co-Branding Agreement's "Choice of Language" provision, the parties acknowledged and agreed

> that they have mutually required that this Agreement and all documentation notices, judicial proceedings, and dispute resolution and arbitration entered into, given, instituted pursuant to, or relating to, this Agreement be drawn up in the English language.  Any translations of this Agreement or its attachments that are provided are done solely for the convenience of Seller, and, in all cases, the English language version of such documents shall govern.

(ECF No. 22-2).  Also, the Co-Branding Agreement's "Dispute Resolution" provision reads:

> All disputes in connection with this agreement or the execution thereof
> shall be settled through good faith negotiations.  In case no settlement can
> be reached, the case may then be submitted for arbitration to the China
> International Economic and Trade Arbitration Commission
> Shanghai Commission in accordance with its arbitration rules.  The
> arbitration shall take place in Shanghai and the decision of the
> Commission shall be final and binding upon both parties; neither
> party shall seek recourse to a law court or other authorities to appeal
> the decision.  The arbitration fee shall be borne by the losing party.

(ECF No. 22-2).

At the May 27, 2015 hearing, Scott Franklin credibly testified that the Co-Branding Agreement was the "master agreement" that Lumos and CEEG initially entered into when they commenced their business relationship.  (Bridge Tr. 14:17:18-14:19:16).  The Co-Branding Agreement was the "umbrella" that set forth the terms for how Lumos and CEEG would operate and do business together.  (*Id.*)  It "outlined the terms, the pricing, the buying commitment, warranty, general business terms of our agreement."  (*Id.* at 14:18:44-14:18:50).  Franklin further explained that the subsequent sales contracts were purchase orders that flowed from the Co-Branding Agreement.  Franklin stated that pursuant to the Co-Branding Agreement's Choice of Language provision, Lumos and CEEG always communicated in the English language.  (*Id.* at 14:17:18-14:19:54).  In fact, Franklin testified that CEEG drafted the Choice of Language provision and was always very accommodating in communicating with Lumos in English.  (*Id.*)

<u>Sales Contract</u>

Lumos argues that under the terms of the Co-Branding Agreement, Lumos and CEEG were to enter into individual sales contracts for each order.  Thus, on May 17,

2010, Lumos and CEEG entered into the sales contract at issue in this dispute ("Sales Contract").  (ECF No. 22-1).  Pursuant to the Sales Contract, on October 23, 2010 and November 21, 2010, Lumos received shipments of solar battery modules from CEEG.  Upon its inspection of the modules, Lumos discovered defects including "discoloration, streaking, burning, and cracking of the cells."  (ECF No. 22-1).  Also, under the Sales Contract,

> [a]ny dispute arising from or in connection with this Contract shall be settled through friendly negotiations.  Failing that, then shall be submitted to China International Economic and Trade Arbitration Commission Shanghai Subcommission for arbitration which shall be conducted in accordance with the commission's arbitration rules in effect at the time of applying for arbitration.  The arbitral award is final and binding on both parties.  The applicable law shall be in the United Nations Convention on Contracts for the International Sale of Goods.

(ECF No. 2-5).

On or about December 10, 2010, Lumos provided notice to CEEG that the modules were defective and that Lumos would be filing a warranty claim.  On December 23, 2010, Scott Franklin wrote a follow-up email to Sally Fan, a CEEG sales manager, providing notice that Lumos would not make any payments on the Sales Contract until CEEG addressed its warranty claim for the defective modules.  On January 6, 2011, Sally Fan responded to Franklin stating that Lumos should replace the defective modules with "other non-defective modules in Lumos' inventory right away" and that replacing them would be "no problem."  (ECF Nos. 22-1 and 22-6).  Lumos subsequently replaced the defective modules with non-defective modules from its inventory, but never received the substitutes from CEEG.

On January 26, 2011, Franklin sent another email to Lumos' contacts at CEEG (Sally Fan, Stephen Cai, Thomas Liu, and Xinglei ("Lester") Wang) noting the lack of response to Lumos' warranty claim.  Then, on April 28, 2011, Franklin sent a formal letter to Thomas Liu regarding the warranty claim and provided additional supporting documentation.  In May 2011, Xinglei ("Lester") Wang performed an on-site inspection of the defective modules and confirmed to Lumos that the modules were defective.

On October 30, 2011, Franklin sent an email to Willis He, the CEO of CSUN, USA, requesting resolution of the warranty issue.  He replied that he would "look into it," but Lumos heard nothing from CEEG or CSUN until December 19, 2012.  On December 19, 2012, counsel for CEEG sent Lumos a demand letter for payments due on the shipments of defective modules.  On December 22, 2012, Franklin sent a response noting that Lumos had been withholding payment pending resolution of the warranty issue.  On January 24, 2013, CEEG's counsel sent a second demand letter threatening arbitration if Lumos failed to send payment for the defective modules by January 31, 2013.  Franklin testified at the May 27, 2015 hearing that he continued to communicate with CEEG's counsel through email in an attempt to reach a business solution.

On April 4, 2013, Lumos received a document delivered by DHL written in Chinese, with no English translation provided.  All previous communications between Lumos and CEEG had been in English.  On May 7, 2013, Franklin sent CEEG's counsel an email offering a settlement for the dispute.  CEEG's counsel sent an email in response stating, in part:

Please note that the letter you received was from CIETAC, the arbitration

institution to which Lumos agreed in its sales contracts with CEEG (Shanghai) Solar Science Technology Co., Ltd.  The contractual arbitration clause did not specify a language for the arbitration and the CIETAC default language is Chinese.  Your company has been sued in arbitration in China.  I recommend you seek counsel and avoid the risk of an adverse award for failure to defend your company in the arbitration.

(ECF No. 22-1 and 22-14).  On May 19, 2013, Franklin sent CEEG's counsel a follow-up email inquiring as to CEEG's response to Lumos' settlement proposal.  CEEG's counsel replied, noting that CEEG rejected the proposal.

In the meantime, Lumos engaged the services of a translator to translate the April 4, 2013 document written in Chinese.  Lumos also hired Chinese counsel to prepare its defense.  On June 20, 2013, Franklin sent a letter to CIETAC, explaining Lumos' difficulties in translating CIETAC's correspondence and requesting additional time to prepare its defense at the arbitration.  CIETAC agreed to an extension of time of the first hearing date for the arbitration.  However, because the arbitration notice was written in Chinese, CIETAC's 15-day deadline to participate in the appointment of arbitrators had passed by the time Lumos was able to translate the notice and retain counsel.  Thus, Lumos was unable to appoint an arbitrator or consult with CEEG on the appointment of the chief arbitrator to the three-person tribunal that ultimately handed down the arbitration award.  Lumos filed an objection noting that it did not accept the composition of the arbitral tribunal.  On September 13, 2013, Lumos' objection was rejected, and on June 13, 2014, the arbitral panel issued an award in favor of CEEG and against Lumos.[1]

---

[1] The Tribunal ordered Lumos to pay the following amounts: (1) $1,372,445.10 for two outstanding payments for goods; (2) $74,991.00 in interest for the overdue

At the May 27, 2015 hearing, Scott Franklin testified that he was unaware that the Chinese documents he received on April 4, 2013 constituted an arbitration notice. He had been frequently communicating exclusively in English via email with CEEG's counsel the month prior to receiving the Chinese documents and no mention was made of the arbitration notice or that Franklin should be aware that CEEG was sending him such a document.  In fact, he testified that because all prior communications with CEEG had been in English, he assumed that the documents were unimportant or at the very least, not time-sensitive, and made a note to contact CEEG's counsel to inquire about the documents.  Approximately 30 days later or as part of the same May 7, 2013 email previously referenced herein, Franklin emailed CEEG's counsel and asked about the Chinese documents.  CEEG's counsel responded stating that this was a Chinese arbitration notice and that Lumos should retain Chinese counsel.  This email response was the first time Franklin learned about the pending Chinese arbitration.  (Bridge Tr. 14:23:50-14:32:02).  Franklin went on to describe the process of retaining Chinese counsel to represent him in the Chinese arbitration, which he characterized as a "surprisingly" complicated process.  (*Id.* at 14:28:54-14:29:00).  Shortly thereafter, Franklin learned that CIETAC's 15-day deadline to participate in the appointment of arbitrators had expired by the time Lumos was able to translate the notice and retain Chinese counsel.

---

payment; (3) $103,006.25 in costs; (4) $37,398.40 in attorney fees; and (5) $33,041.29 in arbitration costs.  (ECF No. 2).

III.   <u>DISCUSSION</u>

This is an action to confirm an arbitral award granted in China to a Chinese corporation against a United States corporation pursuant to the New York Convention. 9 U.S.C. § 201.  The New York Convention is a multilateral treaty that governs foreign arbitral awards.  Its purpose is to encourage the recognition and enforcement of international arbitral awards, to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that is quicker and less costly than litigation.  *See Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998).  The New York Convention provides that "[a] court shall confirm the award unless its finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  The party opposing confirmation bears the burden on proving that one of the seven defenses set forth in the New York Convention applies.  *Id.*  The burden is a heavy one, and the showing is high to avoid confirmance of the award.  *Id.*  Judicial review is "very limited" in order to undermine the goals of arbitration.  *Id.*

Article V of the New York Convention provides the following grounds of refusal to recognize and enforce an arbitral award: "(1) the parties to the agreement were under some incapacity or the agreement is not valid under the laws the parties have subjected it to; (2) the party against whom the award was invoked did not receive proper notice; (3) the award contains decisions on matters outside the scope of the arbitration agreement; (4) the composition of the arbitral authority was not in line with the agreement of the parties or was not in line with the law under which the award was

made; and (5) the award is not binding on the parties, or it has been set aside by a competent authority in the country where the award was made." *Guang Dong Light Headgear Factory Co., Ltd. v. ACI Intern., Inc.*, No. 03-4165-JAR, 2005 WL 1118130, *5 (D. Kan. May 10, 2005) (citing 9 U.S.C. § 207, New York Convention, art. V).

Here, Lumos first asserts that the Chinese arbitration award should not be confirmed because the Sales Contract states that all disputes between the parties "shall be settled through friendly negotiations." (ECF No. 2-5). Lumos argues that there was no bargaining process, and that CEG "did nothing more than state its position and then figuratively fold its arms and say, 'take it or leave it.'" (ECF No. 32 at 2). For reasons stated on the record at the May 27, 2015 hearing, I find little merit to this argument and reject it summarily.

Second, Lumos argues that it "did not receive notice reasonably calculated to apprise it of the pendency of the arbitration and allow it a meaningful opportunity to be heard, as required to satisfy due process." (ECF No. 32 at 2). Citing *Qingdao Free Trade Zone Genius Int'l Trading Co., Ltd. v. P and S International, Inc.*, No. 08-1292-HU, 2009 WL 2997184 (D. Or. Sept. 16, 2009), Lumos also argues that the composition of the arbitral panel was not in line with the parties' agreement or the applicable law. Specifically, CEEG's failure to properly provide notice of the arbitration in English deprived Lumos of the opportunity to participate in the selection of the arbitration panel because by the time Lumos found a translator to explain the contents of the notice and then retain counsel, the 15-day deadline had passed. In *Qingdao*, the district court denied the petition by a Chinese company to enforce an arbitral award handed down in

China because the defendant Oregon lumber company did not receive notice reasonably calculated to apprise it of the pending arbitration.  *Id.*  Similar to this case, the plaintiff in *Qingdao* argued that the defendant: (1) agreed in a sales contract to arbitrate any disputes through the Qingdao Arbitration Commission and according to its rules; (2) received a copy of the rules in English; and (3) by signing the contract, consented to the notice in Chinese.  *Id.* at *4.  The court held that

> [w]hile these circumstances could lead to the inference that [defendant] knew it had agreed to arbitrate disputes with Qingdao in China, and had reason to suspect that arbitration proceedings in China might be brought against [defendant] by Qingdao ..., they do not generate an inference that [defendant] had actual knowledge that Qingdao commenced an arbitration proceeding, to take place on a particular date in a particular place.  Nor does the contract ... contain a provision under which [defendant] agreed to service of process in Chinese.

*Id.*  CEEG opposes this argument, claiming that the governing contract is the Sales Contract, not the Co-Branding Agreement.  CEEG argues that there is no choice of law provision in the Sales Contract, "so the language of the arbitration proceeding was to be Chinese and CIETAC acted in accordance with the Agreement and provided proper notice to Lumos when it sent the Notice of Arbitration to Lumos in Chinese."  (ECF No. 29 at 8).  CEEG further contends that since Lumos ultimately participated in the arbitration proceeding in China, it obviously received notice.  I reject CEEG's position and agree with Lumos.

For reasons stated on the record at the May 27, 2015 hearing, based on my review of all of the parties' submissions, arguments, and the credible testimony of Scott Franklin, I find that CEEG did not give Lumos proper notice of the Chinese arbitration

which resulted in Lumos being deprived of the opportunity to meaningfully participate in the selection of arbitrators on the panel.  Guided by the Second Circuit's statements in a similar scenario, "[w]hile we acknowledge that there is a strong public policy in favor of international arbitration, ... we have never held that courts must overlook agreed-upon arbitral policies in deference to that policy."  *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005) (holding that "the issue of how the third arbitrator was to be appointed is more than a trivial matter of form.  Article V(1)(d) of the New York Convention itself suggests the importance of arbitral composition, as failure to comport with an agreement's requirements for how arbitrators are selected is one of only seven grounds for refusing to enforce an arbitral award.").

Moreover, as to the issue of proper notice, I also find Scott Franklin's testimony credible as to the fact that the Co-Branding Agreement is the governing agreement between Lumos and CEEG and that all subsequent sales contracts flowed from that master agreement.  Thus, under the Co-Branding Agreement's Choice of Language provision, all "documentation notices, judicial proceedings, and dispute resolution and arbitration entered into, given, instituted pursuant to, or relating to, this Agreement [shall] be drawn up in the English language."  (ECF No. 22-2).[2]  Prior to the arbitration notice, all communications between Lumos and CEEG were conducted in English pursuant to the Co-Branding Agreement.  Franklin testified that because all prior communications with CEEG had been in English, he had no reason to believe the April

---

[2] I note that the Sales Contract, which CEEG urges should control in this case, also provides that the English language "shall govern."  (ECF No. 5-1).

4, 2013 documents contained a notice of arbitration.  Like the *Qingdao* Court, I find that

all of these circumstances do not generate an inference that Lumos had actual

knowledge that CEEG had commenced an arbitration proceeding in China.  Lumos has

carried its heavy burden of proving that two grounds for refusal to recognize and

enforce an arbitral award set forth in Article V of the New York Convention apply to this

case.  Thus, recognizing my limited review of arbitral awards under the New York

Convention,  I find that the arbitration award cannot be confirmed under the grounds set

forth in Article V(1)(b) and (d) of the New York Convention.

IV.   CONCLUSION

Based on the foregoing, it is

ORDERED that CEEG's Petition to Confirm Arbitration Award and for Entry of

Judgment (ECF No. 2) is **DENIED** pursuant to Article V(1)(d) and (b) of the New York

Convention.  It is

FURTHER ORDERED that Lumos' Motion to Dismiss Petition to Confirm

Arbitration Award (ECF No. 22) is **GRANTED** for the reasons stated on the record at the

May 27, 2015 hearing and set forth herein.  This matter is **DISMISSED WITH**

**PREJUDICE.**

Dated:  May 29, 2015

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge